# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 20-1769V

THERESA COPLEY-SMITH,

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

             Respondent.

Chief Special Master Corcoran

Filed: April 22, 2025

---

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for Petitioner.*

*Naseem Kourosh, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT
### AND DECISION AWARDING DAMAGES[1]

    On December 4, 2020, Theresa Copley-Smith filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine that she received on October 23, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters ("SPU").

---

[1] Because this Ruling and Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Because the parties could not informally resolve the claim, they were ordered to file briefs setting forth their respective arguments. After a full review of the evidence, I find it most likely that Petitioner suffered the onset of her shoulder pain within 48 hours of her October 2019 vaccination, has satisfied all Table requirements for a SIRVA injury, and is otherwise entitled to compensation for her SIRVA (in the amount specified herein).

## I.    Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which "is consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a results of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g., tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCV) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i)    No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii)    Pain occurs within the specified time-frame;

> (iii)    Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv)    No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropath).

42 C.F.R. § 100.3(c)(10).

## II.    Entitlement

### A.    Relevant Factual History

On October 23, 2019, Ms. Copley-Smith (then 62-years-old) received a flu vaccine intramuscularly in her left deltoid at a pharmacy clinic. Ex. 1 at 2–4; Ex. 12 at 1–2. Prior to the subject vaccination, Ms. Copley-Smith did not have a past medical history for left shoulder injury. *See generally* Ex. 2.

A month later, on November 29, 2019,[4] Petitioner sent a message to her primary care physician's ("PCP") office, noting that she had received the subject vaccination on October 23, 2019, and "felt burning pain immediately," with subsequent pain and decreased range of motion. *Id.* at 36. She emphasized that it had been over thirty-five days "with no relief." *Id.*

Several days later, on December 2, 2019, Petitioner saw a treater complaining of left shoulder pain, weakness, and reduced range of motion ("ROM"). Ex. 32 at 34. Upon examination, Ms. Copley-Smith exhibited tenderness to palpation of the lateral aspect and increased discomfort with external rotation. *Id.* She was prescribed Ultram and a nine-day taper of Prednisone. *Id.* at 34.

Petitioner underwent an MRI of her left shoulder on December 6, 2019—the results of which revealed abnormal injury involving the infraspinatus with partial tear extending from the insertion and along the bursal aspect, as well as slight edema along the humeral head. Ex. 2 at 159. Approximately one month later, on January 9, 2020, Petitioner saw Dr. Daniel Prohaska at Advanced Orthopaedic Associates, and reported persistent pain following receipt of a flu vaccine on October 23, 2019, with "a constant dull, ache with intermittent spikes of 8 out of 10 sharp, stabbing, throbbing pain diffusely in the shoulder, radiating up into her neck and down the arm." *Id.* at 132. An exam revealed left shoulder tenderness and reduced active and passive ROM. *Id.* at 132–33. Dr. Prohaska diagnosed Petitioner with left shoulder adhesive capsulitis, administered a steroid and analgesic injection, and referred Petitioner to physical therapy ("PT"). *Id.* at 133–34.

On January 29, 2020, Petitioner attended an initial PT evaluation, at which time she demonstrated "[active] ROM and [passive] ROM deficits in L[eft] shoulder flexion, abduction, [external rotation], and [internal rotation]." Ex. 7 at 139. Between February 5 to May 19, 2020, Petitioner completed an additional fourteen sessions of PT. *Id.* at 13–15, 107–62.

During a visit with Dr. Prohaska on April 9, 2020, Petitioner reported ongoing stiffness, loss of ROM, and described "an intermittent 3-4 out of 10 aching pain [ ] diffusely in her shoulder" which "wakes her 4-5 nights weekly." Ex. 6 at 13–14. On exam, Ms. Copley-Smith demonstrated decreased ROM and pain in her left shoulder, as well as

---

[4] In the intervening post-vaccination timeframe, the medical records establish that Petitioner messaged her treater approximately eight times to discuss unrelated issues (i.e., schedule a sonogram for groin pain; request a prescription for glucometer test strips; diabetes check-up and medication management). *See* Ex. 2 at 37–50. But as Respondent notes, she did not mention any left shoulder symptoms.

positive Neer[5] and Hawkins[6] Tests. *Id.* Following a PT session on May 19, 2020, Petitioner also saw Dr. Prohaska to discuss surgical options—to which she elected to proceed with surgery. *Id.* at 7–9. She reported "intermittent 2 out of 10, aching pain in the anterior and lateral aspect of [her] shoulder" and continued to complain of reduced range of motion. Ex. 2 at 127; Ex. 6 at 7–9. Dr. Prohaska gave Petitioner a Quick-Fit shoulder immobilizer, as well as discussed the association between diabetes and adhesive capsulitis. *Id.*

Ms. Copley-Smith underwent arthroscopic surgery and manipulation under anesthesia of the left shoulder on June 8, 2020. Ex. 6 at 20–22; Ex. 8 at 43. Beginning June 9 through July 29, 2020, Petitioner completed an additional twenty-two PT sessions. *See* Ex. 7 at 57–107, 141–46, 151–55. The note from her last session stated that Petitioner "demonstrated improvement in [upper extremity passive and active] ROM"; however, she continued to complain of some tightness and weakness. Ex. 7 at 141–46. Ms. Copley-Smith was subsequently put on a PT hold for thirty days "to ensure no increased symptoms." *Id.* at 146.

On September 10, 2020, Petitioner suffered a minor stroke affecting her left side. Ex. 2 at 15–16; Ex. 9 at 7, 13–15, 24–26, 30–32, 44–63, 151, 182, 199–203; Ex. 12 at 4–5. A month later, she visited her PCP for her annual physical exam. Ex. 2 at 12. At this time, she reported that "she is recovering well from her left shoulder surgery, continues to regain mobility," and that she continues to recover from her stroke. *Id.*

## B.    The Parties' Arguments

### 1.  Petitioner

Petitioner contends that she has fulfilled the criteria for a Table SIRVA. *See* Petitioner's Brief, dated Oct. 6, 2023 (ECF No. 42) ("Br.").[7] First, Petitioner briefly maintains that she did not have any history of pain, inflammation, or dysfunction in her left shoulder prior to the subject vaccine administration. *Id.* at 26. Second, she argues that the onset of her shoulder symptoms occurred within forty-eight hours of vaccination—

---

[5] A Neer's test is used to check for the presence of shoulder impingement. The patient is asked to pronate the forearm fully and then the arm is passively flexed until it is above the patient's head. By doing so, the subacromial space is reduced and caused pain if shoulder impingement is present. Stanford Medicine 25, *How to Conduct a Shoulder Exam*, https://stanfordmedicine25.stanford.edu/the25/shoulder.html (last visited Apr. 22, 2025).

[6] A Hawkins-Kennedy Test requires the patient's elbow and shoulder to be flexed at 90 degrees so that the examiner may internally rotate the shoulder while also performing a cross-body adduction of the arm. If the patient notes any pain then the test is considered positive. Stanford Medicine 25, *How to Conduct a Shoulder Exam*, https://stanfordmedicine25.stanford.edu/the25/shoulder.html (last visited Apr. 22, 2025).

[7] Petitioner also argues she can establish a causation-in-fact claim, but because I am finding that the Table SIRVA elements are met, I do not include discussion of that aspect of the case.

relying on multiple medical record entries which consistently document the onset of her symptoms with the administration of her October 23, 2019 flu vaccine. *Id.* at 27–28; *see also* Ex. 2 at 36 (discussing 11/29/2019 visit to Dr. Gonzalez and describing immediate burning sensation post-vaccination); Ex. 6 at 16 (documenting 1/2/2020 visit with Dr. Prohaska and indicating Petitioner has suffered "persistent" pain since receiving the flu vaccine).

Believing her pain would heal with time, Petitioner also maintains that she experienced a symptoms onset within 48 hours, despite only visiting her PCP thirty-seven-days post-vaccination with specific complaints regarding left shoulder symptoms, while having eight intervening medical encounters before then. Br. at 34. She similarly notes the ample record evidence documenting her pain and reduced range of motion as limited to the left shoulder only. *Id.* at 35; *see also* Ex. 2 at 34–35.

Lastly, Petitioner disagrees with Respondent's assertion that her diabetes diagnosis—which "pre-disposes [her] to adhesive capsulitis"—prevents her from demonstrating a Table SIRVA. Br. at 36. In response, she argues that "[p]redisposition or increased risk may make an individual more susceptible to a develop an injury in the right circumstances, but [it] do[es] not equate with causation of that injury." *Id.* at 37.

### 2. Respondent

Respondent maintains that the record does not demonstrate that Petitioner's injury meets at least two of the criteria set forth by the Table—onset and lack of another condition or abnormality that would explain her symptoms. *See* Respondent's Report, dated May 25, 2023 (ECF No. 38); Respondent's Opposition Brief, dated Nov. 16, 2023 (ECF No. 43) ("Opp.") at 6, 8.

First, Respondent argues that Petitioner has failed to establish that she experienced onset of shoulder pain within forty-eight hours of the subject vaccination. Respondent notes that Petitioner did not report shoulder symptoms until thirty-seven days post-vaccination, and before that she had eight encounters with her PCP to address a range of issues. *Id.* The eight intervening medical encounters indicate that Petitioner was "generally diligent about reporting and seeking treatment for various medical issues," and thus could also have addressed her shoulder concerns earlier. *Id.* at 7.

Second, Respondent contends that Petitioner has failed to establish that no other condition or abnormality exists that would better explain her symptoms, given her diabetes diagnosis. *Id.* Petitioner was initially diagnosed with diabetes "on or around November 14, 2019, and first reported shoulder pain on November 29, 2019. Opp. at 7–8; Ex. 2 at 36, 44–50. Respondent also contends that Ms. Copley-Smith's treating physicians' association of her shoulder injury with her receipt of the flu vaccine was

"based entirely on [her] own reporting, [and] not on any reasoned analysis." Opp. at 8. In addition, Respondent emphasizes a treater note on May 19, 2020, stating that the physician "educated [Petitioner] about diabetes and its association with adhesive capsulitis," and noting further that "studies suggest that changes in connective tissue due to uncontrolled blood glucose is a significant risk factor." *Id.*; Ex. 2 at 129. Respondent relies on the American Academy of Orthopaedic Surgeons to bulwark this contention, emphasizing the greater associated risk for adhesive capsulitis in individuals with diabetes. Opp. at 8 (citing American Academy of Orthopaedic Surgeons, *Frozen Shoulder*, https://orthoinfo.aaos.org/en/diseases--conditions/frozen-shoulder (last visited Apr. 1, 2025).

### C.    Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that Petitioner has preponderantly satisfied the Qualifications and Aids Interpretation ("QAI") requirements for a Table SIRVA.

### 1.    Petitioner has no Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Ms. Copley-Smith's medical history does not evidence pre-vaccination explanatory "pain, inflammation, or dysfunction," and Respondent does not contend that it does. Therefore, the first SIRVA criterion is met.

### 2.    Pain Occurs with the Specified Timeframe (Onset)

In order to meet the definition of a Table SIRVA, a petitioner must show that she experienced pain within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B) and § 100.3(c)(10)(ii) (QAI criteria)).

Respondent's objection rests on the fact that Ms. Copley-Smith did not *report* her shoulder injury to a medical provider until thirty-seven days after vaccination, despite having eight intervening medical encounters—all addressing other kinds of ailments, but which suggest Petitioner could have also raised shoulder concerns as well had they existed. Opp. at 7.

There is no dispute that Petitioner waited a little over a month before being seen for her left shoulder symptoms. But this is not an inordinately long delay. *See, e.g.*, *Larish v. Sec'y of Health & Hum. Servs.*, No. 18-20V, 2019 WL 5266886, at *6–10 (Fed. Cl. Spec. Mstr. July 2, 2019) (finding onset of shoulder pain within 48 hours of vaccination despite a nine-week delay in treatment because petitioner's medical records recorded immediate post-vaccination pain). Moreover, there are a variety of reasons that an individual may put off complaining of SIRVA-like, post-vaccination symptoms. Many individuals expect, and are often advised, that there will be pain at the injection site after

vaccination. This can lead to them putting off treatment. An individual's particular threshold for pain, or desire to avoid costly or unnecessary medical treatment, are other reasons.

In addition, it is not always reasonable to expect claimants to complain of shoulder issues during visits with medical professionals for unrelated matters. Thus, although this record does suggest Petitioner had the ability and opportunity to seek help with her shoulder issues sooner than she did, the intervening treatment events do not prevent a finding that her onset began close-in-time to vaccination.

Petitioner has also supplemented the record with statements supporting her alleged onset. Thus, she states in her affidavit that "shortly after the vaccination was injected, [she] began to experience a burning sensation in [her] left arm." *See* Petitioner's Affidavit, filed as Ex. 12 (ECF No. 32) ("Petitioner's Aff.") at 1–2. She also maintains that "[she] had been in pain since [she] received [her] flu shot [on October 23, 2019] and while [she] had hoped the pain would improve with time, it was actually worse, so [she] planned to see [her] physician." *Id.* And the record establishes that once she sought treatment, she consistently reported vaccination-related onset. *See* Ex. 2 at 36; Ex. 6 at 16); Ex. 7 at 136–37.

Accordingly, the totality of the evidence preponderantly supports the conclusion that Ms. Copley-Smith's shoulder pain likely began within 48 hours of her vaccination.

### 3. Petitioner Experienced Pain and Loss of Range of Motion in her Left Shoulder

In alleging a SIRVA, it must also be shown that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria). Not only do the medical records consistently describe reports from Petitioner regarding pain and reduced range of motion affecting only her left shoulder, but Respondent has not put forth an argument to suggest Petitioner's symptoms extended beyond that of her left shoulder. Therefore, the third SIRVA criterion is met.

### 4. Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent argues that Ms. Copley-Smith's diabetes diagnosis is a more likely cause of her adhesive capsulitis, noting that Ms. Copley-Smith "was initially diagnosed with diabetes on or around November 14, 2019, and first reported shoulder pain on November 29, 2019". Opp. at 7. In addition, at Petitioner's first orthopedist appointment on January 9, 2020 (when she was diagnosed with adhesive capsulitis), the

relevant record provides "no indication that [Ms. Copley-Smith] discussed her diabetes with [the orthopedist] at the time." *Id.* at 8. And during a visit with Dr. Prohaska on May 19, 2020, she was informed of "diabetes and its association with adhesive capsulitis," along with the fact that "studies suggest that changes in connective tissue due to uncontrolled blood glucose is a significant risk factor." *Id.*; *see also* Ex. 2 at 129.[8]

In response, Petitioner maintains that Dr. Prohaska and her PCP "were aware that [Ms. Copley-Smith] was treated for diabetes, and yet associated her left shoulder injury with her October 23, 2019 flu vaccine." Br. at 37; Reply at 7. In fact, the record of her January 9, 2020, visit with Dr. Prohaska notes her history of current "prescription medications, including Metformin, which is primarily prescribed to treat type 2 diabetes." Reply at 7; *see also* Ex. 6 at 26. Petitioner also notes that Respondent has not "alleg[ed] [P]etitioner's diabetes as an overt alternative cause in her analysis of an off-Table SIRVA claim," and thus contends that she has sufficiently demonstrated that no other condition or abnormality is present that would explain her symptoms. Reply at 9.

The issue of Petitioner's diabetes as explaining her shoulder issues does present a closer call. Respondent has demonstrated it could be causal of the kinds of symptoms Petitioner experienced. However, I am able to find on this record that the totality of the evidence supports Petitioner. First, I have found that onset likely did occur close-in-time to vaccination, making it more likely the vaccination was associated with her shoulder pain. Second, Petitioner's diabetes has not on this record been shown to have manifested long before vaccination (evidence which would better support it as a causal factor), even if it was *diagnosed* close to when she complained (in a record document, notably) of shoulder pain. In addition, Petitioner has demonstrated that her treaters seemed to favor the vaccine as causal. And there is no record evidence from later in 2020 that subsequent medical visits reviewed again the possibility of a diabetic cause for her shoulder issues.

## B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provided preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

---

[8] In his Opposition, Respondent includes an excerpt from the American Academy of Orthopaedic Surgeons which discusses several factors that may increase an individual's risk for developing frozen shoulder, including diabetes. Opp. at 8; *see also* American Academy of Orthopaedic Surgeons, *Frozen Shoulder*, https://orthoinfo.aaos.org/en/diseases--conditions/frozen-shoulder (last visited Apr. 22, 2025) (stating that "[f]rozen shoulder occurs much more often in people with diabetes. The reason for this is not known. In addition, diabetic patients with frozen shoulder tend to have a greater degree of stiffness that continues for a longer time before "thawing.").

The record shows that Ms. Copley-Smith received a flu vaccine intramuscularly in her left shoulder on October 23, 2019. Ex. 1 at 3, 4; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at ¶ 6; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). I have also found that Petitioner's pain and reduced range of motion was limited to her left shoulder. 42 C.F.R. § 100.3(c)(10). Finally, I find that there was no condition or abnormality that would explain Petitioner's symptoms after vaccination. *Id.* Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from October 23, 2019 (48 hours after vaccination), the records undoubtedly demonstrate that Ms. Copley-Smith suffered the residual effects of her shoulder injury for more than six months. *See, e.g.*, Ex. 8 at 43 (documenting Petitioner's arthroscopic surgery and manipulation under anesthesia of the left shoulder). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## III.   Damages

The parties have also briefed damages in this case, which is limited to requests for an award of actual pain and suffering, plus past unreimbursable treatment expenses.

### A.  Legal Standards for Damages Awards

Compensation awarded pursuant to the Vaccine act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, and award not to exceed $250,000.00." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgement award

10

such expenses which (i) resulted from the vaccine-realted injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requestion. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mste. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[9] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt several years ago by a particular decision from the Court. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590.

---

[9] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards—it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### B. Prior SIRVA Compensation within SPU[10]

#### 1. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2024, 3,696 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,588 of these cases, with the remaining 108 cases dismissed.

2,075 of compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to an informal settlement or concession).[11] In only 200 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[12] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[13]

---

[10] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[11] The remaining 1,513 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[12] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,846 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[13] Of course, even though *any* such informally resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[14] Agreement |
|---|---|---|---|---|
| Total Cases | *270* | *2,206* | *30* | *1,891* |
| Lowest | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| 1st Quartile | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| Median | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| 3rd Quartile | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| Largest | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## 2. Pain and Suffering Awards in Reasoned Decisions

In the 200 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $85,000.00 as the median amount. Only nine of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[15]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment—over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence or mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases were positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point scale and

---

[14] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[15] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions—occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### C. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of that injury to be considered. In determining appropriate compensation for pain and suffering, I have carefully reviewed and considered the complete record in this case, including all medical records, declarations, plus all filings submitted by both Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Ms. Copley-Smith requests $120,000.00 for her pain and suffering. She explains that she was physically strong and active prior to her vaccination. Br. at 45. She states that "she experienced burning pain with administration of the flu vaccine on October 23, 2019," and that "[h]er left shoulder pain persisted and within days, her left shoulder became stiff." *Id.* (citing Petitioner's Aff. at 1–2.). Ms. Copley-Smith underwent treatment for approximately ten months and maintains that she continues to experience "aching at night, stiffness and some increased pain with movement" and that "[t]he discomfort still wakes [her] some nights." Petitioner's Aff. at 7.

To support her requested award, Petitioner cites six cases: *Jackson v. Sec'y of Health & Hum. Servs.*, No. 20-0051V, 2023 WL 4401125 (Fed. Cl. Spec. Mstr. June 2, 2021) (awarding $125,000.00 for pain and suffering); *Barry v. Sec'y of Health & Hum. Servs.*, No. 20-1874V, 2023 WL 4742421 (Fed. Cl. Spec. Mstr. June 23, 2023) (awarding $113,000.00 for pain and suffering); *Kestner v. Sec'y of Health & Hum. Servs.*, No. 20-0025V, 2022 WL 2447499 (Fed. Cl. Spec. Mstr. Mar. 10, 2023) (awarding $115,000.00 for pain and suffering); *Stokes v. Sec'y of Health & Hum. Servs.*, No. 19-752V, 2021 WL 6550888 (Fed. Cl. Spec. Mstr. Dec. 17, 2021) (awarding $125,000.00 for pain and suffering); *Wilson v. Sec'y of Health & Hum. Servs.*, No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021) (awarding $130,000.00 for pain and suffering); and *Smith v. Sec'y of Health & Hum. Servs.*, No. 19-0745V, 2021 WL 2652688 (Fed. Cl. Spec. Mstr. May 28, 2021) (awarding $125,000.00 for pain and suffering).

Respondent, by contrast, submits that the lesser sum of $100,000.00 is appropriate for pain and suffering. Opp. at 12. In his view, the petitioners from Ms. Copley-

Smith's comparable cases either suffered more severe injuries, involved non-vaccine related medical issues in conjunction with their SIRVA injury, suffered complications from surgery, or documented impacts on family and work obligations that justified the pain and suffering awards therein. Opp. at 13–15. Respondent also offers comparable cases of his own. *See Felland v. Sec'y of Health & Hum. Servs.*, No. 20-0406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022) (awarding $100,000.00 for pain and suffering); *Juno v. Sec'y of Health & Hum. Servs.*, No. 18-643V, 2022 WL 17850717 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) (awarding $100,000.00 for pain and suffering); *Clendaniel v. Sec'y of Health & Hum. Servs.*, No. 20-213V, 2021 WL 4258775 (Fed. Cl. Spec. Mstr. Aug. 18, 2021) (awarding $60,000.00 for pain and suffering).

A thorough review of the medical records reveals that Ms. Copley-Smith suffered a moderate shoulder injury that was serious enough for arthroscopic surgery to be performed, and for an extensive course of treatment to be pursued. Petitioner participated in 37 PT visits (15 pre-surgery and 22 post-surgery), underwent one steroid injection and one MRI of her left shoulder, and took five oral prescription medications over the course of her treatment. At her final PT session, approximately ten months post-vaccination, records document demonstrated improvement in Petitioner's active and passive ROM, but with some continued tightness and weakness. Ex. 7 at 145. By October 2020, Ms. Copley-Smith reported continued recovery from her left shoulder surgery, as well as gradual improvement in regaining her mobility. Ex. 2 at 12.

Although the record establishes that Ms. Copley-Smith experienced the onset of shoulder pain almost immediately after vaccination, her slight delay in treatment has some bearing on the award to be issued—but I do not deem it so dilatory that it requires a large adjustment downward. What is left is a "surgery SIRVA" case of moderate course—meaning a six-figure pain and suffering award is appropriate, although not a high one.

I find that the cases of *Kestner* (cited by Petitioner) and *Issertell* (cited by neither party) which resulted in actual pain and suffering awards of $115,000.00 and $112,500.00, to be most helpful in determining the appropriate award for pain and suffering herein.[16] The *Kestner* petitioner consistently reported pain levels of 2/10 and 6/10 prior to surgery, received one cortisone injection, was prescribed medication, attended 35 PT sessions, and underwent surgical intervention. 2023 WL 2447499, at *5– 6. There, petitioner reported a 95% improvement in her symptoms following her surgery and after being discharged from PT. *Id.* In *Issertell*, the petitioner underwent arthroscopic shoulder surgery and her treatment course consisted of one cortisone injection, 32 therapeutic visits (14 PT sessions, 12 chiropractic visits, and 6 acupuncture visits), and

---

[16] *Issertell v. Sec'y of Health & Hum. Servs.*, No. 20-0099V, 2022 WL 2288247 (Fed. Cl. Spec. Mstr. May 17, 2022).

an MRI. 2022 WL 2288247, at *7. The duration of Ms. Issertell's injury was approximately ten months. *Id.*

Of the two, *Kestner* is particularly useful—although I find that some personal circumstances in this matter (delay in scheduling her surgery due to the Covid Pandemic, Petitioner's inability to attend additional PT sessions following her stroke due to her insurance benefits) all counsel in favor of a higher award. Accordingly, I deem **$116,000.00** a reasonable sum for actual pain and suffering.

### D.    Unreimbursed Medical Expenses

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation … determined to be reasonably necessary." Section 15(a)(1)(B). Petitioners bear the burden of proof with respect to such items, as with each element of compensation they request. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

Petitioner initially sought $4,606.50[17] for expenses related to her injury. Br. at 44. However, in response to Respondent's opposition (in which he argues only $3,582.12 in expenses have been substantiated), Petitioner has since made several deductions, and is now requesting an award for past unreimbursed expenses totaling $4,085.86. Opp. at 18; Reply at 15–18.

Respondent does, however, contest Petitioner's entitlement to some of the expenses she includes in the total sum. Opp. at 17. For example, Respondent notes a request for $0.95 in mileage costs for a visit to West Wichita Family Physicians regarding dyshidrosis on May 5, 2020. Petitioner, in response, maintains that the notes from Dr. Gonzalez's during this visit indicate a discussion of her ongoing left shoulder injury. Reply at 16; Ex. 2 at 23. Similarly, at another visit to West Wichita Family Physicians on October 8, 2020—for which Petitioner requests $0.95 in mileage costs—Petitioner presented for her annual physical exam, at which time she reported that her recovery was going well, and she continued to regain mobility. Ex. 2 at 12. Respondent, however, argues that Petitioner did not report or seek treatment for new or ongoing shoulder symptoms. Opp. at 18.

I agree with Respondent that the expenses and mileage costs related to these two instances are not sufficiently supported by the record, and are otherwise unrelated to her

---

[17] I note, and as Respondent pointed out in his opposition, Petitioner's lists supporting her incurred mileage costs presents a total of $205.93, and *not* $695.72. Accordingly, her initial overall total should be $4,116.71.

shoulder injury. Therefore, based on the above, I award only $3,594.17 for past unreimbursed expenses.

## Conclusion

For all the reasons discussed above and based on consideration of the record as a whole, **I find that $116,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

**I therefore award Petitioner a lump sum payment of <u>$119,594.17</u> representing compensation in the amount of $116,000.00 for pain and suffering and $3,594.17 for past unreimbursable expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** The amount represents compensation for all damages that would be available under Section 15(a).

I approve a Vaccine Program award in the requested amount set forth above to be made to Petitioner. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment herewith.[18]

**IT IS SO ORDERED.**

<u>/s/ Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[18] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.